**SO ORDERED.**

**SIGNED this 10th day of September, 2013.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge

_____

**Designated for online use, but not print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **In Re:** | |
| **JONATHAN ISAAC SCHUPBACH and AMY MARIE SCHUPBACH,** | **CASE NO. 11-13633** **CHAPTER 11** |
| **DEBTORS.** | |
| **BANK OF COMMERCE & TRUST CO.,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 12-5047** |
| **JONATHAN ISAAC SCHUPBACH and AMY MARIE SCHUPBACH,** | |
| **DEFENDANTS.** | |

**MEMORANDUM OPINION AND ORDER**
**DENYING COMPLAINT FOR EXCEPTION OF DEBT FROM DISCHARGE**

The Complaint in this adversary proceeding was filed by Bank of Commerce &

Trust Company, Wellington, Kansas (Bank), to except from discharge under 11 U.S.C.

§§ 523(a)(2) and (a)(6) its claim against Debtors Jonathan I. Schupbach and Amy M. Schupbach (collectively Debtors) and for a determination of the amount excepted from discharge. The Court has jurisdiction.[1] By Memorandum Opinion and Order issued on June 7, 2012, the Court granted Debtors' motion to dismiss the § 523(a)(2) count because it was not timely filed.[2] A two-day trial to the Court on the § 523(a)(6) count was held on July 9 and 10, 2013, after which the Court took the matter under advisement. Having carefully considered the pleadings, the evidence, the exhibits, and the statements of counsel, the Court is now ready to rule. For the reasons stated below, the Court denies the Complaint and finds that Bank's claim against Debtors is dischargeable.

## THE ALLEGATIONS OF THE COMPLAINT.

Bank alleges that Debtors should not be discharged from damages caused by conversion. The conversion claim arises from six prepetition loans made by Bank to Debtors and their company, Schupbach Investments. Each of these loans was made for the purchase or refinance of an individual residential property.[3] It is alleged that the loan

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). There is no objection to venue or jurisdiction over the parties.

[2] Dkt. 10.

[3] As set forth below, the purposes of the loans as stated in the notes refer to business investment and purchase of properties. Bank does not contend that the loan proceeds were misused when devoted to the purchase of the property securing the specific note. This opinion therefore focuses only upon the alleged requirement that the loan proceeds be used to renovate and repair the properties securing the loans.

2

proceeds were advanced for the specific purpose of renovating the six homes and that

Debtors converted the loan proceeds when the proceeds were used for other purposes,

resulting in a willful and malicious injury of approximately $170,000 to Bank, within the

meaning of § 523(a)(6).

**FINDINGS OF FACT.**

Beginning in 2001, Debtors engaged in the business of buying, owning, and selling

homes in low income areas of Wichita, Kansas. Initially the business was conducted as a

proprietorship, which by 2004 owned up to 50 homes. Starting in about 2004, the

business was conducted through Schupbach Investments, L.L.C. (Schupbach

Investments). Jonathan Schupbach was the manager and 50% owner. Amy Schupbach

was a member and 50% owner. Both Jonathan and Amy worked full time for Schupbach

Investments, with Jonathan making the decisions about properties to purchase, renovate,

rent, and sell, and Amy maintaining the financial records.

Schupbach Investments generally purchased distressed homes for less than fair

market value, and then either rented or sold the properties. The purchase and renovation

costs were financed through various lending institutions, including Bank. Bank started

making loans to Schupbach Investments in 2004, when Clint Lawrence, currently a vice

president of Bank and through whom the Schupbachs had obtained business loans while

he was employed by another financial institution, solicited the Schupbachs' business.

3

Although there is disagreement as to the exact number of loans,[4] the evidence clearly showed that Jonathan Schupbach had a well-established and harmonious business relationship with Clint Lawrence and Bank. There was mutual trust, and a pattern of business practices developed. Schupbach Investments also obtained financing from other financial institutions, but Jonathan Schupbach generally contacted Bank to ascertain its interest before contacting other lenders.

Schupbach Investments filed for relief under Chapter 11 of the Bankruptcy Code on May 16, 2011. Jonathan and Amy Schupbach filed for relief on July 16, 2011, under Chapter 13, but the case was later converted to Chapter 11. Schupbach Investments' schedule A listed 165 parcels of real property, 39 of which were mortgaged to Bank. Bank filed a proof of claim for $748,748.72 against the Schupbachs.[5]

The six loans which are the basis for the conversion claim were made over a two-and-a-half-year period and involve single residential properties requiring improvements before being rented. The dates and the amounts of the loans, and the addresses and the purchase prices of the Wichita properties mortgaged to secure the loans are: September

---

[4] Jonathan Schupbach testified that in 2010 there were 42 different loans outstanding with Bank and 20 to 30 loans had previously been retired. Clint Lawrence testified that he originated 35 to 40 Schupbach loans, and 32 of these were secured by individual homes. Jonathan Schupbach testified that there were 30 to 50 loans with Bank secured by individual homes. Clint Lawrence testified that Bank made 15 to 20 loans to Schupbach Investments to finance properties needing improvements; it appears that all but six of these loans were repaid.

[5] Case no. 11-13633, claim 22-1.

4

18, 2007 loan for $41,600, secured by 2611 E. 13th Street,[6] purchased for $5,000;[7]

February 12, 2009 loan for $39,000, secured by 1539 N. Hillside,[8] purchased for $6,000;[9]

June 29, 2009 loan for $36,000, secured by 1524 N. Lorraine,[10] purchased for $2,000;[11]

July 14, 2009 loan for $45,750, secured by 1753 N. Chautauqua,[12] purchased for

$13,500;[13] March 25, 2010 loan for $37,500, secured by 434 S. Illinois,[14] purchased for

$18,500;[15] and April 9, 2010 loan for $33,750, secured by 1504 N. Erie,[16] purchased for

$3,700.[17]

Each of the six loans was originated in accord with the customary procedures used

by Bank and Schupbach Investments when Schupbach Investments desired financing to

be secured by a home needing renovation. Jonathan Schupbach would contact Clint

---

[6] Exh. 3.

[7] Exh. 17.

[8] Exh. 4.

[9] Exh.17.

[10] Exh. 5.

[11] Exh. 17.

[12] Exh. 6.

[13] Exh. 17.

[14] Exh. 7.

[15] Exh. 17.

[16] Exh. 8.

[17] Exh. 17.

5

Lawrence.  If Bank was interested in making the loan, Clint Lawrence would contact the appraiser whom he used for Wichita properties and who valued approximately 10 homes per year for loans to Schupbach Investments, resulting in the appraiser's being very familiar with Jonathan Schupbach and his business.  Bank would instruct the appraiser to value the subject property as if the needed renovations and repairs had been completed.  Then Jonathan Schupbach would show the property to the appraiser and inform him that he intended to make the "usual" renovations, meaning such things as roof repair, painting, new siding, new HVAC, and floor covering.  Jonathan Schupbach did not provide the appraiser with a list of anticipated improvements for each property, but the appraisal report for each property included a list prepared by the appraiser of anticipated repairs.  For example, the appraisal for the East 13th Street property states, "Owner is totally redoing the home inside and out.  New electrical, new plumbing, new bath fixtures, dry wall, insulation, new porch, paint and siding.  Storage shed,"[18] and the appraisal for the North Hillside property states, "New paint inside and out, carpet being replaced, new appliances, heat and air as needed, plumbing as needed and electrical as needed."[19]  The appraiser became comfortable with Jonathan Schupbach and his intent to make the needed repairs.

Bank would then loan Schupbach Investments an amount equal to 70% to 80% of the appraised value of the selected property for various terms, some for twenty years and

_____

[18] Exh. 3, Bates-stamp no. E13ST000019.

[19] Exh. 4, Bates-stamp no. NHILLST000036.

6

some for one year.  Each loan was evidenced by a promissory note executed by Debtors

personally and on behalf of Schupbach Investments.[20]  The improvements enumerated in

the appraisal report were not stated in the note.  Each note would be secured by a

mortgage of the subject residential property executed by Debtors on behalf of Schupbach

Investments.  No additional collateral was pledged, and the loans were not cross-

collateralized.  Debtors did not sign the appraisal report but were provided an opportunity

to receive a copy of the report before closing.  There is no evidence with respect to any of

the six loans that Debtors requested a copy or that a copy was provided to them before the

closing.  As to the six loans in issue, both Jonathan Schupbach and Amy Schupbach

testified that they did not receive a copy of the appraisal report before executing the note

for any of the properties.

When each of the six loans was made, the loan amount, usually less some loan

costs, was disbursed to Schupbach Investments by a cashier's check in a lump sum.  The

proceeds were deposited into Schupbach Investments' general business account at another

bank.  There was no requirement or expectation by Clint Lawrence that the proceeds

would be segregated from other funds.  Bank no made attempt to retain a security interest

in the loan proceeds.

The loan proceeds were used for the general business expenses of Schupbach

---

[20] The Debtors do not contest their liability on the notes.  The affairs of Debtors and Schupbach Investments were commingled.  Neither Bank nor Debtors raised any issues concerning such commingling or the failure to maintain the separateness of the individuals and the limited liability company.  At trial, it was assumed that the actions of Debtors were the actions of Schupbach Investments and vice versa.

7

Investments.  Some of the withdrawals from the account were for Debtors' personal expenses, such as home mortgage payments and utility costs.  But Debtors, who worked full time for Schupbach Investments, were not paid salaries and regarded use of company funds for their personal expenses as their compensation.  Salaries paid Debtors would have been regarded as business expenses; payment of personal expenses in lieu of salaries should also be so regarded.  Further, examination of the bank statements shows that there were sufficient deposits from sources other than Bank's loans to cover the personal expenses.  The Court therefore rejects Bank's position that the proceeds were used in part for purposes other than the business of Schupbach Investments.

Amy Schupbach, who maintained the financial records, could not identify any specific expenditures for improvements to the six mortgaged properties, but she did testify that some of the ongoing expenses, such as for contractors whom Schupbach hired to repair and maintain the company's properties, could have spent time on some of the six homes.  Jonathan Schupbach testified that although he disagreed with some of the specific renovations listed on the appraisal reports, he intended to renovate the properties mortgaged to secure the six loans.  As a business practice, Schupbach Investments made repairs on an as-needed basis.  Easy turnaround homes were repaired first, and repair of those needing significant work was deferred.  In 2010, Jonathan Schupbach estimated that there were 18 homes in line for repairs, and that although he intended to repair the six homes financed by Bank, all the company's resources were being devoted to other properties.  As to the six homes, the electrical service at 2611 E. 13th Street was

8

improved, the 1524 N. Lorraine property was cleaned out and secured, and broken windows were repaired at 434 S. Illinois and 1504 N. Erie.

Bank contends that the loan proceeds of each of the six loans were to be used exclusively for the renovation of the home securing each note. Clint Lawrence referred to the loans as "construction loans" and testified that if the entire proceeds were not used for the intended purpose, they were to be returned. Clint Lawrence testified that he and Jonathan Schupbach discussed structuring loans to be secured by single residences to require the submission of receipts for work performed, but rejected this method as impractical because Schupbach Investments' business model made it nearly impossible to document expenditures on individual properties. Bank made approximately 20 loans secured by individual residences requiring renovations in accord with the procedures discussed herein; of these, it appears that all were paid or refinanced, except for the six which are the subject of this litigation.

The amount of each loan was determined by the appraised value; the cost of anticipated repairs was not estimated, and the amount loaned was not related to the cost of the upgrades. The appraisal reports are the only documents in the loan files listing intended improvements. Nothing in the loan documents required the borrower to present invoices, make a report as to completed renovations, or complete the renovations by a certain date. The properties were not inspected by Bank. Clint Lawrence testified that it was not his practice to inquire whether improvements had been made, since he had no reason to believe that they would not be. He could not recall any specific conversations

9

with Debtors about devoting the loan proceeds to the improvements. Jonathan Schupbach testified that he never discussed specific improvements with Clint Lawrence.

The only provisions in the loan documents signed by Debtors or provided to them before closing that relate to the use of the loan proceeds are "purpose of loan" sections of the notes. Those provisions read as follows: "Refinance and Improve Business Investment";[21] "Refinance Property 1539 N Hillside — Wichita";[22] "Business Investment 1524 N Lorraine";[23] "Business Investment 1753 N Chautauqua";[24] "Business Investment Purchase and Improvement";[25] and "Business Investment Purchase and Improvement 1504 N Erie."[26] The notes include integration clauses. The first two loans provide: "All parties signing below acknowledge receiving a completed copy of this Note and related documents, which contain the complete and entire agreement between Lender and any party liable for payment under this Note. No variation, condition, modification, change or amendment to this Note or related documents shall be binding unless in writing and signed by all parties."[27] The last four notes provide: "No amendment or modification of this Note is effective unless made in writing and executed by you and me. This Note and

---

[21] Exh. 3, Bates-stamp no. E13ST000002.

[22] Exh. 4, Bates-stamp no. NHILLST000002.

[23] Exh. 5, Bates-stamp no. LORRAINE000004.

[24] Exh. 6, Bates-stamp no. CHAUT000004.

[25] Exh. 7, Bates-stamp no. S.ILLINOIS000004.

[26] Exh. 8, Bates-stamp no. ERIE00003.

[27] Exh. 3, Bates-stamp no. E13ST000002; Exh. 4, Bates-stamp no. NHILLST000002.

10

the other Loan Documents are the complete and final expression of the agreement."[28]

"Loan Documents" is defined to mean "all the documents executed as a part of or in connection with the Loan."[29]

In middle or late 2009, Clint Lawrence spoke with Jonathan Schupbach on the phone about the 13th Street property because it was in an area where the City of Wichita was buying properties for road improvements. He learned for the first time that the property had not been repaired, except for electrical work, even though the loan had been made in 2007. Clint Lawrence testified he assumed that Schupbach Investments had the loan proceeds, except those used to buy supplies for the intended renovations of the 13th Street property, in its bank account.

Even though Bank had notice in 2009 that the improvements to the 13th Street property listed in the 2007 appraisal had not been made, Bank continued to make loans,[30] and did not change its loan documentation or monitoring procedures. Clint Lawrence did not inquire of Debtors about the status of renovation of the six properties until late 2010, when Schupbach Investments was headed for bankruptcy. Debtors never represented to Bank that the improvements had been completed.

Neither of Debtors understood the purpose of the loans as stated in the notes to

---

[28] Exh. 5, Bates-stamp no. LORRAINE000007; Exh. 6, Bates-stamp no. CHAUT000007; Exh. 7, Bates-stamp no. S.ILLINOIS000006; and Exh. 8, Bates-stamp no. ERIE000005.

[29] Exh. 5, Bates-stamp no. LORRAINE000002; Exh. 6, Bates-stamp no. CHAUT000002; Exh. 7, Bates-stamp no. S.ILLINOIS000003; and Exh. 8, Bates-stamp no. ERIE000002.

[30] The 434 S. Illinois and 1504 N. Erie loans were made in 2010.

11

mean that the proceeds were to be held apart from the company's other assets and devoted solely to renovations of the mortgaged homes. Jonathan Schupbach testified that he believed the funds were provided for use in the operations of Schupbach Investments and that he was to do what he saw fit to run the business. Although he intended to eventually make the repairs on the financed homes, he did not understand the proceeds to be earmarked for this purpose and did not discuss the use of the loan proceeds with Clint Lawrence until October 12, 2010, when bankruptcy was imminent. Amy Schupbach testified she understood that the purpose of the loans was to fund Schupbach Investments' business, which was the purchase, improvement, rental, and sale of distressed real estate in low income areas of Wichita, and that the loans provided funds for the company to continue in business. She executed the loan documents at her home when they were presented to her by Jonathan Schupbach. Clint Lawrence could not recall having met with Amy Schupbach regarding the six loans. There was no evidence that she ever met with the appraiser.

Bank's dischargeability complaint is premised upon the Schupbachs' alleged conversion of the loan proceeds because they were not used for the intended purpose of renovating the six properties. For each of the six properties, damages were calculated by subtracting the purchase price and estimated closing costs of $1,000 from the loan proceeds. The total damages claimed are $172,000.[31] Although Bank received the six

---

[31] Exh. 17. At trial, Clint Lawrence testified that the amount claimed in that exhibit should be reduced by $6,000 to reflect closing costs.

12

properties from Schupbach Investments during the bankruptcy case, the values of the properties either on the date of filing or when received by Bank were not considered in the damages calculation.

**DISCUSSION.**

### A. Preliminary matters.

There are two preliminary matters which need to be addressed.  First, Bank contends that Debtors' Answer to the Complaint binds them to Bank's view as to the purpose of the six loans.  For each of the loans, the Complaint alleges that the loan was made, that the purpose of the loan was to make the renovations listed in the appraisal report for the property, and that based upon the representations and personal guarantees of the Schupbachs, Bank made a loan to Schupbach Investments "to renovate, modify and improve the property" securing the note.[32]  In their Answer, Debtors admitted these factual allegations and that they "knew that the loan proceeds . . . were required to be used on the homes that Schupbach Investments purchased.[33]  Bank argues that "[w]hile defendants contend that they believed these loan proceeds would be used for any purpose, without restriction, they are bound by the admissions in their Answer that the purpose of these loans was for the renovation, modification and improvement of the six (6) homes they sought to purchase."[34]

---

[32] Dkt. 1.

[33] Dkt. 13.

[34] Dkt. 42 at 11, n. 4.

Case 12-05047   Doc# 45   Filed 09/10/13   Page 13 of 26

Although the Court has difficulty understanding why Debtors admitted the factual allegations of the Complaint and the allegation that they "knew . . . the proceeds . . . were required to be used on the homes that Schupbach Investments had purchased," it declines to find that the Answer limits the Court's ability to consider Debtors' understanding of the purposes of the loans. The purposes of the loans alleged in the Complaint are more general than Bank's position at trial, during which it essentially contended that the loans' purposes required that the proceeds be earmarked for renovation. This shift of position is similar to the subtle difference in the understandings of Bank and Debtors as to the loans' purposes, as reflected in the testimony and exhibits discussed below. Justice would not be served by foreclosing Debtors' ability to contest Bank's understanding of the purposes of the loans and the allowed use of the proceeds. The duty of the Court is to resolve the controversy between the parties, not to parse the meaning of admissions in the Answer.[35]

Second, as stated above, the claim alleged in Count I of the Complaint for denial of the discharge of a debt for false pretenses, false representations, and actual fraud under § 523(a)(2), was dismissed as untimely. The evidence in this case is such that the most natural way to view a possible denial of discharge is from the perspective of fraud, but this temptation must avoided. The only claim before the Court is for denial of discharge of Bank's claim of damages from a willful and malicious injury to Bank's property based

---

[35] The Court also notes that even if the admissions in the Answer were broadly construed to mean that Bank had a property interest in the loan proceeds sufficient to find that Debtors' failure to use the proceeds for the admitted purposes constituted a conversion, denial of discharge would nevertheless be precluded because of the absence of a willful and malicious injury.

14

upon alleged conversion.

**B.  Denial of discharge under § 523(a)(6) for a debt for willful and malicious injury from conversion.**

Subsection 523(a)(6), the basis for Bank's remaining dischargeability claim, provides as follows:

> (a) A discharge under section . . . 1141 . . . of this title does not discharge an individual debtor from any debt —
>     . . .
>     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The Supreme Court has held that this subsection encompasses "only acts done with the actual intent to cause injury."[36]  The fact that the word "willful" modifies the word "injury" indicates that "nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury."[37]  Without proof of both a willful act and malicious injury, the objection to discharge fails.[38]  "The term 'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'"[39]  "[M]ost courts have held that an injury inflicted intentionally and deliberately, and either with the intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to

---

[36] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[37] *Id*. (emphasis in original).

[38] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

[39] *Id. (quoting Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

15

result from the debtor's act, constitutes willful and malicious conduct under section 523(a)(6)."[40] The burden of proof is upon the creditor to establish by a preponderance of the evidence that the debt is nondischargeable.[41]

A debt for an injury caused by conversion may be nondischargeable under § 523(a)(6), if it is willful and malicious.[42] "But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice."[43]

Conversion is defined as "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights."[44] A security interest may be converted.[45] Likewise cash may be the property which is the subject of a claim of conversion,[46] such as when funds are placed in

---

[40] 4 *Collier on Bankruptcy*, ¶ 523.12[2] at 523-93 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2013).

[41] *Grogan v. Garner*, 498 U.S. 279, 283-91 (1991).

[42] *C.I.T. Financial Servs., Inc., v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir. 1989).

[43] *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934).

[44] *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205, 1210 (1986).

[45] *See Davis v. Aetna Acceptance*, 293 U.S. at 331-33; *Farmers State Bank v. FFP Operating Partners, L.P.*, 23 Kan. App. 2d 712, 715, 935 P.2d 233, 235 (1997).

[46] *Commerce Bank, N.A., v. Chrysler Realty Corp.*, 76 F. Supp. 2d 1113, 1118 (D.Kan. 1999).

16

the custody of another for a specific purpose and diverted to a different use.[47]  However ,

there is no action "for conversion of a mere debt or chose in action.  Hence, where there is

no obligation to return identical money, but only a relationship of debtor and creditor, an

action for conversion of the funds representing the indebtedness will not lie against the

debtor."[48]

### C.  Bank has not sustained its burden to show Debtors converted Bank's property.

In this case, Bank claims a debt for injury from conversion, but the Court finds

that Debtors did not convert Bank's property.  The pretrial order states, "Plaintiff

contends that defendants willfully and maliciously injured the plaintiff by intentionally

placing at risk, using, misappropriating and/or converting plaintiff's collateral for their

benefit resulting in damage to the plaintiff."[49]  In its trial brief, Bank contends the

evidence demonstrates a conversion of the loan proceeds because "(a) the purpose of each

loan was to renovate, modify and improve these [six] homes; (b) that the only collateral

securing each loan was the home itself . . . ; and (c) that little, if any, of the Bank's loan

proceeds were used to improve these properties."[50]

The evidence is inadequate to establish injury from conversion of collateral.

---

[47] *Dillard v. Payne*, 615 S.W.2d 53, 55 (Mo. 1981) (diversion of funds advanced by client to attorney with instructions to place in trust account for use to cover actual costs of legal action).

[48] *Temmen v. Kent-Brown Chevrolet Co*., 227 Kan. 45, 50, 605 P.2d 95, 99 (1980) (*quoting* 18 Am. Jur. 2d, Conversion § 10).

[49] Dkt. 37 at 2.

[50] Dkt. 42 at 9-10.

17

Bank's presentation of evidence and its damage calculations were based solely upon the theory that the property converted was the cash proceeds of the six loans. Yet, there is no evidence that Bank even attempted to retain a security interest in the cash proceeds. Rather, it is uncontroverted that the six properties were the sole collateral for Bank's loans. There is no evidence and no contention that Debtors exercised rights with respect to the mortgaged homes inconsistent with Bank's interest as mortgagee. Debtors did not convert Bank's collateral.[51]

Debtors also did not convert the loan proceeds. As stated above, an essential element of conversion is an interference with the plaintiff's interest in the property allegedly converted. In this case, that element is lacking. The loan proceeds were distributed to Schupbach Investments by cashiers' checks. When delivered, they ceased to be Bank's property.[52] Debtors cannot be liable to Bank for converting property in which Bank had no interest.

Bank seeks to overcome the foregoing deficiency in its conversion claim by asserting that a conversion occurred when the loan proceeds were used for purposes other

---

[51] Debtors did fail to improve Bank's collateral, but the Court has not been provided with any authority that failure to enhance collateral constitutes a conversion of the collateral.

[52] *Maneval v. Davis (In re Davis)*, 155 B.R. 123, 131 (Bankr. E.D. Va. 1993) (where plaintiffs delivered check to debtor made payable to him personally and received in return shares of stock in company debtor owned, check no longer belonged to plaintiffs and could not be subject of conversion claim against debtor); *Taylor v. Sanders (In re Sanders)*, 105 B.R. 111 (Bankr. M.D. Fla. 1989) (where plaintiff wrote check to lease brokerage corporation to pay off purchase option of car and lease brokerage corporation commingled check proceeds with other funds and never paid lessor for car title, plaintiff could not sue for conversion because once check was delivered to corporation, it was no longer property of plaintiff); *P & S X-ray Co., Inc., v. Dawes (In re Dawes)*, 189 B.R. 714, 721 (Bankr. N.D. Ill. 1995) (under law of conversion, once check is delivered, monies no longer belong to maker of check).

18

than those for which they were loaned.  The Court finds this conversion theory to be valid.  *In re Atkins*[53] is an example of a case applying this theory.  Debtor Atkins and his company borrowed $332,065 for the purchase of 337 specific scooters for inventory, to be comprised of three brands, 200 Moderna, 72 Kina, and 65 Barcelona.  The scooters were to be collateral for the loan.  Debtor executed a note which specified the use of the loan proceeds and represented he would use the proceeds only to purchase the 337 scooters.  However, he purchased only 290 scooters (182 Moderna, 54 Kina, and 54 Barcelona) and failed to retain the remaining loan proceeds.  The misuse of the loan proceeds was found to be willful and malicious.  The claim on the note was excepted from discharge under § 523(a)(6).

In this case, the Court finds the evidence regarding the limitations upon the use of the loan proceeds provided by Bank to Schupbach Investments is insufficient to support a claim of conversion.  The notes state the purposes of the six loans as follows:  "Refinance and Improve Business Investment";[54] "Refinance Property 1539 N  Hillside - Wichita";[55] "Business Investment 1524 N Lorraine";[56] "Business Investment 1753 N Chautauqua";[57]

---

[53] *Randall v. Atkins (In re Atkins)*, 458 B.R. 858 (Bankr. W.D. Tex. 2011).

[54] Exh. 3, Bates-stamp no. E13ST000002.

[55] Exh. 4, Bates-stamp no. NHILLST000002.

[56] Exh. 5, Bates-stamp no. LORRAINE000004.

[57] Exh. 6, Bates-stamp no. CHAUT000004.

"Business Investment Purchase and Improvement";[58] and "Business Investment Purchase and Improvement 1504 N Erie."[59]  Bank asserts these terms mean that the loan proceeds were to be segregated from other assets of Schupbach Investments and were to be used only for the repair of the specific properties.  Debtors contend that the stated purposes allowed use of the proceeds for the general business purposes of Schupbach Investments, which were the purchase and improvement of homes, including those mortgaged to secure the particular loans.  In other words, the parties agree that the loan proceeds were to be used for Debtors' business; the disagreement is only about whether the proceeds of the six loans could be used for this general purpose, or whether the proceeds of each of the six loans were to used exclusively for the renovation of the property securing the specific advance.

The Court finds that the purposes stated in the notes are ambiguous, in that both Bank's and Debtors' readings are reasonable interpretations of the notes.  Therefore, to ascertain if the use of the proceeds was limited to the repair of the specific properties which secured each note, the Court considers the other loan documents, the circumstances surrounding the making of the loans, and the actions of the parties after the loans were closed.

The notes are the only documents purporting to state the purposes of the loans, and they do not enumerate the anticipated repairs.  The only documents in the loan files

[58] Exh. 7, Bates-stamp no. S.ILLINOIS000004.

[59] Exh. 8, Bates-stamp no. ERIE00003.

addressing the specific improvements for each property are the appraisal reports. But they were not signed by the borrower or Debtors, and there is no evidence that Debtors received copies before the execution of the notes. The appraisal reports are therefore excluded from consideration as a part of Schhupbach Investments' agreements with Bank by the integration clauses contained in each of the notes. Further, the lists of repairs in the appraisal reports were drafted by the appraiser and not assented to by Jonathan Schupbach or Bank. Clint Lawrence instructed the appraiser to value the properties as if the repairs had been made; he did not consider the value of the properties without the repairs or the cost of the repairs, which was never estimated. Clint Lawrence did not discuss the repairs needed on each property with Jonathan Schupbach. The loan documents did not state a date by which repairs were to be completed or require evidence that repairs were made. There was no provision that precluded commingling the loan proceeds with other assets of Schupbach Investments and no requirement that Schupbach Investments return any funds not used for repairs.

Although Clint Lawrence testified that he regarded the loans as construction loans, his conduct does not support this interpretation of the transactions. He testified that he and Jonathan Schupbach discussed structuring loans to be secured by single residences to require the submission of receipts for work performed, but rejected this method as impractical because Schupbach Investments' business model made it nearly impossible to document expenditures on individual properties. The loan documents contain no restriction on deposits of the loan proceeds, which were disbursed in lump sums by

21

cashiers' checks. Bank made 20 or more loans to Schupbach Investments secured by individual properties needing improvements without requiring an accounting of the use of the proceeds; most were paid in full or refinanced; it appears that only the six were outstanding on the date of filing. Neither Clint Lawrence nor Jonathan Schupbach could recall any conversation about restrictions on the use of the proceeds. According to Jonathan Schupbach, Clint Lawrence focused his attention on the general business health of Schupbach Investments, not the condition of any specific property. Amy Schupbach had no discussions with Clint Lawrence in which she was informed that the proceeds of the six loans were to be devoted only to the repair of the home securing each loan, rather than to the general business expenses of Schupbach Investments.

Bank's evidence is insufficient for the Court to conclude that the use of the loan proceeds was restricted in such a way that Schupbach Investments' use of the proceeds for general business purposes constituted a conversion. The relationship between Bank and Debtors is that of creditor-debtor; Debtors have no liability for conversion.

**D. The evidence is insufficient to conclude that Debtors willfully and maliciously injured Bank.**

Finally, even assuming that (1) the loan agreements required Schupbach Investments to use the loan proceeds exclusively for the improvement of the mortgaged properties, (2) such requirement was breached when the proceeds were used for general business purposes, and (3) Debtors are liable to Bank for conversion, Bank has not sustained its burden to prove that the alleged injury from conversion was willful and

22

malicious, as required for the debt to be excepted from discharge under § 523(a)(6).

As stated by the Supreme Court, "[t]here is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception [the predecessor to § 523(a)(6)]. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice."[60]

As to the willful element, "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[61] The debtor must desire the consequences of his act or believe that the consequences are substantially certain to follow.[62] "Willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property."[63] "Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's [interest in the property converted] and the debtor's knowledge that the conduct will cause particularized injury."[64]

Bank's evidence is inadequate to prove a willful injury by either Jonathan or Amy

---

[60] *Davis v. Aetna Acceptance Co.*, 293 U.S. at 332.

[61] *Kawaauhau v. Geiger*, 523 U.S. at 61.

[62] *Panalis v. Moore*, 357 F.3d at 1129.

[63]*Mitsubishi Motors Credit of Amer. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999) (*citing Posta*, 866 F.2d at 367).

[64] *Id*.

23

Schupbach. There is no direct evidence of intent to injure. Rather, both Debtors credibly testified that they intended to repay the loans and believed they were using the loan proceeds in accord with the terms of the loan agreements. Likewise, there is no indirect evidence of willful injury. Assuming the loan proceeds were Bank property notwithstanding Bank's payment of the proceeds to Schupbach Investments, the evidence does not establish that Debtors had knowledge of Bank's interest. Further, Debtors had no knowledge that their conduct in using the loan proceeds for the general business operations of Schupbach Investments would cause injury to Bank's property.

In contrast to the definition of "willful," the definition of "malicious" for purposes of § 523(a)(6) has not been authoritatively declared by the Supreme Court. The Tenth Circuit has stated that "the term 'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury,'"[65] but this blurs the distinction between "willful" and "malicious." The Tenth Circuit has also stated that "evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the requisite 'malice' in addition to 'willfulness' is present."[66] A commentator has observed that "[t]he element of malice distinguishes nondischargeable intentional torts from ordinary intentional tort

---

[65] *Panalis v Moore*, 357 F.3d at 1129 (*quoting Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).

[66] *Dorr, Bentley & Pecha, CPA's, P.C, v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993).

actions."[67]

Assuming a conversion, Bank's evidence fails to show a malicious injury, however defined. There was absolutely no evidence that Debtors intended to injure Bank. Debtors intended to repair the residences and to pay the loans. There is no basis to conclude that any injury to Bank was substantially certain to follow from Schupbach Investments' use of the loan proceeds for its general business operations. Prior loans from Bank for repair of residences had been paid or refinanced, even though the loan proceeds were not dedicated to the repair of the specific property securing the note. Assuming a conversion, it was an ordinary tort; it was not malicious.

**CONCLUSION.**

For the foregoing reasons, the Court denies Bank's claim for denial of discharge of its claim for conversion damages under § 523(a)(6). Bank's evidence is insufficient to find that Debtors caused injury to Bank by converting Bank's property and, even if the evidence were sufficient to find such an injury, Bank has not proven that any damages it suffered were the result of a willful and malicious injury, as required for denial of discharge of its claim under § 523(a)(6). Bank's claim of nondischargeability for false pretenses, false representations, and actual fraud under § 523(a)(2) was previously dismissed as untimely. Finding no basis for denial of discharge, the Court concludes the count of the Complaint for determining the amount excepted from discharge is moot.

---

[67] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 57:44 at 57-125 (Thomson Reuters 2013).

Therefore, Bank is not entitled to any of the relief sought in the Complaint, and Debtors are entitled to judgment in their favor.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure which makes Rule 52(a) of the Federal Rules of  Civil Procedure applicable to this proceeding.  A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058 which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #